**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LAWSON PRODUCTS, INC., | |
| Plaintiff, | |
| v. | Case No. _____ |
| DONALD CONNER, WILLIAM PRICE, PATRICK BYRON, MIKE MYERS, SHANE PATTERSON, GREG GARDNER, JAMES GOEBEL, STEVEN MARKOWITZ, CAMILLE WATKINS | |
| Defendants. | |

**<u>COMPLAINT</u>**

Plaintiff Lawson Products, Inc. ("Lawson") states as follows for its Complaint against Defendants Donald Conner ("Conner"), William Price ("Price"), Patrick Byron ("Byron"), Mike Myers ("Myers"), Shane Patterson ("Patterson"), Greg Gardner ("Gardner"), James Goebel ("Goebel"), Steven Markowitz ("Markowitz") and Camille Watkins ("Watkins") (collectively, the "Individual Defendants"):

**<u>NATURE OF THE CASE</u>**

1.    The Individual Defendants are former Lawson sales representatives who resigned their Lawson employment to accept employment as sales representatives for Momar, Inc. ("Momar"), one of Lawson's largest and staunchest competitors.

2.    Each of the Individual Defendants signed employment agreements with Lawson containing clear and enforceable restrictive covenants extending no further than necessary to protect Lawson's legitimate interests in its goodwill, trade secrets, confidential information, and strong and longstanding customer relationships. Individual Defendants were free to leave for

Momar under the terms of these agreements. Lawson just asked that in recognition of the competitive nature of the business and its critical proprietary and business interests, Individual Defendants adhere to straightforward and tailored non-solicitation restrictive covenants governing their post-employment business activities for a reasonable time following their Lawson employment. Individual Defendants promised, by executing these agreements, to honor these restrictions. But they did not.

3.      Immediately upon joining Momar, and throughout their respective restricted periods, each of the Individual Defendants engaged in multiple clear breaches of these restrictive covenants. Individuals Defendants' breaches include, among other actions articulated below: soliciting, inducing, and/or encouraging Lawson customers to cease transacting business with Lawson, to reduce their business with Lawson, and encouraging Lawson customers to buy conflicting and competitive products from Momar.

4.       Accordingly, through this action, Lawson respectfully seeks money damages to redress the injuries that it has suffered as a proximate result of the Individual Defendants' breaches of their respective employment agreements.

**PARTIES**

5.      Lawson is a corporation organized under the laws of the State of Illinois. It maintains its principal place of business in Illinois.

6.      Conner is an individual who lives in Texas and is domiciled there. Conner is a former Lawson employee.

7.      Price is an individual who lives in Georgia and is domiciled there. Price is a former Lawson employee.

8.      Byron is an individual who lives in Colorado and is domiciled there. Byron is a former Lawson employee.

9.      Myers is an individual who lives in Idaho and is domiciled there. Myers is a former Lawson employee.

10.     Patterson is an individual who lives in Oregon and is domiciled there. Patterson is a former Lawson employee.

11.     Gardner is an individual who lives in Washington and is domiciled there. Gardner is a former Lawson employee.

12.     Goebel is an individual who lives in Washington and is domiciled there. Goebel is a former Lawson employee.

13.     Markowitz is an individual who lives in Florida and is domiciled there. Markowitz is a former Lawson employee.

14.     Watkins is an individual who lives in Georgia and is domiciled there. Watkins is a former Lawson employee.

## JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between Lawson and Individual Defendants. The citizenship of Plaintiff and the Individual Defendants is set forth in Paragraphs 4 through 14, above.

16.     The amount in controversy exceeds the Court's jurisdictional minimum. The damages Lawson has incurred based on the Individual Defendants' breach of the non-solicitation covenants contained in written employment agreements exceeds, as to each Individual Defendant, $75,000, exclusive of interest and costs.

17.     The Court has personal jurisdiction over each of the Individual Defendants because each Individual Defendant consented to jurisdiction in Illinois under Section 6 of their respective Loyalty and Confidentiality Agreements (the "Lawson Agreement"), which gives rise to Lawson's breach of contract claims against the Individual Defendants. A true and correct copy of each Agreement executed by the Individual Defendants is attached to this Complaint as **Exhibits 1 through 9**.

18.     By entering into the Lawson Agreement, each Individual Defendant waived his/her respective right to contest personal jurisdiction in Illinois.

19.     Venue is proper here as, among other things, each Individual Defendant agreed to exclusive venue in either state or federal court in Cook County, Illinois.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### I.     Overview of Lawson's Business.

20.     Lawson sells and distributes various products and services to the industrial, commercial, institutional, and governmental maintenance, repair, and operations marketplace. This is generally known within the industry as the "MRO Market."

21.     Lawson's customers operate in a wide range of industries, including automotive repair, commercial vehicle maintenance, government, manufacturing, food processing, distribution, construction, oil and gas services, mining, and others.

22.     The type of MRO products Lawson sells and distributes include fastening systems, cutting tools, chemicals, welding products, abrasives, and other related products.

23.     Lawson sells and distributes these MRO products primarily through employee sales representatives, or "ESRs." Each of the Individual Defendants was a Lawson ESR.

24.     Each Individual Defendant is independently a party to a standard written agreement with Lawson. Individual Defendants' Lawson Agreements include, among other terms, certain restrictions on the ability of an ESR to solicit or sell to identifiable customers on behalf of a Lawson competitor. They also include covenants against the disclosure or use of "Confidential Information."

25.     Each Lawson ESR operates in a particular geographic territory, identified in a Territory Addendum to the Agreement.

26.     ESRs are responsible for cultivating existing business relationships, acquiring new customers, expanding sales with existing customers, servicing accounts, and safeguarding valuable customer information for Lawson's benefit.

27.     This customer information includes, for instance, sales order history, pricing, key contact information, and other details about a particular customer's needs, preferences, and buying habits.

28.     A Lawson ESR also benefits from account exclusivity. That is, an ESR who establishes a business relationship with a customer has the sole opportunity to do business with that customer and earn commission income from sales procured for that customer.

29.     This account exclusivity provides a mutual benefit to Lawson and the ESR. The ESR can create a close, personal connection with customers in his or her territory and thus earn incentive commissions. Lawson, in turn, knows that its sales are more likely to grow as the ESR gains a better understanding of customer needs and develops a relationship designed to secure repeat business.

30.     To this end, a substantial majority of Lawson's sales come from repeat, long-term customers who entrust Lawson to service their MRO product needs regularly.

31.     Lawson's ESRs do not just sell MRO products at a customer location, or simply critical technical aptitude not only to make certain that Lawson's customers have the correct product mix, but also to ensure that the customers have a comprehensive understanding of product functionality.

32.     Through training and ESR development, Lawson has expended substantial time, money, and effort in maintaining close and continuing business relationships and goodwill with customers.

33.     These relationships and earned goodwill provide Lawson with a significant competitive advantage in the MRO Market and constitute valuable company assets.

**II.     Lawson's Acquisition of Partsmaster.**

34.     Prior to August 31, 2020, each Individual Defendant was a sales representative for NCH Corporation's Partsmaster division ("Partsmaster").

35.     During their respective employment with Partsmaster, each Individual Defendant signed a substantially similar *Sales Representative Employment Agreement* (the "Partsmaster Agreement"). A true and correct copy of Conner's Partsmaster Agreements is attached to this Complaint as **Exhibit 10**.

36.     Section 5 of the Partsmaster Agreement provides, in relevant part, that the respective Individual Defendant would not, for a period of 18 months after termination of employment:

> [w]ithin the Territory, sell, solicit, service, handle, participate in, assist, coordinate or advise about a sale of products similar or related to [Partsmaster's] Products to any account that [the Employee] sold, serviced, handled, solicited, was assigned or had responsibility for within eighteen (18) months before any termination of employment with Company . . . .

37. The Partsmaster Agreements that each Individual Defendant signed defined "Territory" by identifying certain counties next to their signatures.

38. The Partsmaster Agreements also allowed Partsmaster to "assign this Agreement to any related or successor subsidiary or otherwise."

39. On August 31, 2020, Lawson entered into an Asset Purchase Agreement with NCH Corporation, under which Lawson acquired NCH's Partsmaster division and assumed certain liabilities (the "Partsmaster Acquisition").

40. As a result of the Partsmaster Acquisition, Lawson succeeded to all of the rights and covenants under the Partsmaster Agreements, including those that the Individual Defendants signed.

41. Shortly after the Partsmaster Acquisition, Lawson offered to hire each of the Individual Defendants as Lawson ESRs.

42. Each Individual Defendant accepted Lawson's offer, and each signed their respective Lawson Agreement. *See* Exs. 1-9. Each of the Individual Defendant's Lawson Agreements became effective as of January 1, 2021.

43. Like the Partsmaster Agreements, the Lawson Agreements contain certain post-employment restrictive covenants, including a covenant prohibiting the solicitation of certain customers.

44. Each Lawson Agreement contains a post-termination non-solicitation covenant in Section 3.3, which states

> Employee agrees that for eighteen (18) months following the end of Employee's employment with Company, Employee will not directly or indirectly interfere with Company's business relationships with a Covered Customer, by soliciting or communicating (regardless of who initiates the communication) with a Covered Customer to induce or encourage the Covered Customer to: (i) stop or reduce doing business with Company, or

(ii) buy a Conflicting Product or Service, unless a duly authorized Company officer gives Employee written authorization to do so. Employee agrees that direct interference includes, for example, selling a Conflicting Product or Service to a Covered Customer, or soliciting such a sale. Employee agrees that indirect interference includes, for example, (x) sales management or account management responsibility for a Covered Customer where another person or entity has direct solicitation or sales responsibility, and/or (y) acting in concert with another person or entity to sell a Conflicting Product or Service to a Covered Customer, or to solicit such a sale. The parties agree this restriction is inherently reasonable because it is limited to the places or locations where the Covered Customer is doing business at the time.

45.     Section 3.1 of each Lawson Agreement defines the terms "Covered Customer"

and "Conflicting Product or Service."

46.     In each Lawson Agreement, the term "Covered Customer" means

…any one of the following: (i) a current customer of Company with which Employee has developed a business relationship or had substantial business contact as a result of Employee's employment with Company; (ii) a customer of Company to which Company has made sales in the twelve (12) months preceding the end of Employee's employment with Company, and for which Employee was a point of contact; (iii) a prospective customer of Company, where Employee has been actively discussing, on behalf of Company, a potential business relationship, in the twelve (12) month period preceding the end of Employee's employment with Company; or (iv) a customer of Company about which Employee has received, used or accessed Confidential Information. References to the end of Employee's employment in this Agreement refer to the end, whether by resignation or termination, and without regard for the reason employment ended.

47.     Each Lawson Agreement then defines "Conflicting Product or Service" in

relevant part as

…a product and/or service that is the same or similar in function or purpose to a Company product and/or service, such that it would replace or compete with: (i) a product and/or service Company provides to its customers; or (ii) a product or service that is under development or planning by Company but not yet provided to customers and regarding which Employee was provided Confidential Information in the course of employment.

48.     In substance, the customer non-solicitation covenants in each of the Individual Defendant's Lawson Agreements are similar in purpose to the customer non-solicitation covenants in Section 5 of their respective Partsmaster Agreements. The covenants in both sets of contracts serve to protect (among other things) customer goodwill that sales employees, like each of the Individual Defendants, develop for their employer's benefit.

49.     Each of the Lawson Agreements were supported by reasonable and adequate consideration for the post-employment covenants therein. Each Lawson Agreement recited the specific elements of consideration (which included signing and retention bonuses) in both Section 1.1 and an Exhibit A to the respective Lawson Agreement.

50.     No Individual Defendant objected to any of the Lawson Agreement's terms at any time. At no point prior to signing their respective Lawson Agreement did any Individual Defendant attempt to negotiate any of the covenants contained in the Lawson Agreements.

51.     Lawson paid each of the Individual Defendants the signing and retention bonuses that served as part of the consideration for entering into the Lawson Agreements.

52.     The customer non-solicitation covenant in Section 3.3 of each of the Individual Defendant's Lawson Agreements is an essential feature of the Lawson Agreement. The covenant serves as the foundation for Lawson's willingness to employ ESRs like the Individual Defendants, to assign them the exclusivity to manage accounts, and to vest them with the responsibility for developing customer relationships.

53.     Section 3.3 of each of the Individual Defendant's Lawson Agreements was carefully, and narrowly, designed to protect Lawson's business relationship with the very customers that an ESR solicits and sells to during the time most proximate to termination of the business relationship between Lawson and the ESR.

54.     Lastly, Section 6 of each of the Individual Defendant's Lawson Agreements states that "if Employee is subject to a prior agreement containing post-association obligations to [Lawson], this Agreement and such prior agreement will be read together to provide the greatest protection to [Lawson]."

55.     Read together, the Partsmaster Agreements and the Lawson Agreements prohibit the Individual Defendants, for a minimum of 18 months after termination, from soliciting or selling competitive products to those customers for which they were responsible during their employment with Partsmaster and Lawson.

**III.     The Individual Defendants' Resignations From Lawson and Customer Solicitations on Behalf of Momar.**

**Conner**

56.     Conner's territory as a Lawson ESR included the following counties in Texas: Williamson, Travis, Hays, Bastrop, Caldwell, Comal, Guadalupe and Bexar.

57.     Conner's territory as a Partsmaster sales representative included the following counties in Georgia: Chatham, Effingham, Bryan, Liberty, Screven, Bulloch and McIntosh.

58.     Conner moved from Georgia to Texas in September 2020.

59.     During his employment with Lawson as ESR and previously with Partsmaster, Conner was responsible for developing relationships with existing customers and cultivating prospective customers in his designated territories. In all respects, Conner was the key point of contact for customers to which he sold MRO products on behalf of Lawson and Partsmaster.

60.     Conner was able to develop close relationships with customers of Partsmaster and Lawson, understand their purchasing needs, and earn their trust. Conner had full and complete access to pricing parameters, historical prices charged to customers, sales, marketing, technical, and other information about products and services that Partsmaster and Lawson sold.

61.     This access allowed Conner to facilitate the procurement of orders for, and sales of, MRO products and to better service the customers within his Partsmaster and Lawson territories.

62.     The access Conner enjoyed to this type of customer information was solely for his use on behalf of Partsmaster and Lawson and allowed him to develop customer goodwill, which is crucial to the sales process.

63.     During the last year of his employment with Partsmaster and Lawson, Conner sold MRO products to numerous customers and achieved sales in 2020 above $220,000.

64.     The customers whom Conner contacted on Lawson's behalf in his former territory constitute "Covered Customers" under Section 3.1(a)(i) of his Lawson Agreement.

65.     Conner voluntarily resigned from Lawson on January 15, 2021.

66.     Conner thereafter joined Momar as a sales representative

67.     On March 20, 2021, Price Fiber Mills—Conner's largest account during his employment with Lawson—mistakenly sent a purchase order to Conner's previous Lawson email address. The purchase order approved a quote from Momar.

68.     Price Fiber Mills is located in Chatham County, Georgia and within Conner's former Partsmaster territory. Price Fibers Mills represented nearly half of Conner's total sales volume, far ahead of his second largest Partsmaster/Lawson account.

69.     Later in the Spring of 2021, one of Conner's customers with Partsmaster/Lawson (called "EOM") reported that Conner, on behalf of Momar, had visited it and that it would be transferring its MRO business to Momar moving forward.

70.     Conner solicited MRO product sales, on Momar's behalf, from at least the following five Covered Customers under the Lawson Agreement: Price Fiber Mills in Augusta,

11

Georgia, Price Fiber Mills in Gordan, Georgia, Scott Davis Chip Company, EOM Enviroworx, and EOM Springfield.

71.     Lawson has been unable to reclaim business from these and other accounts assigned to Conner and has suffered a total impairment of customer goodwill with such customers.

72.     Based on historical profit margins associated with MRO sales, the impaired customer relationships and goodwill stemming from Conner's solicitation of these accounts result in lost profits to Lawson in excess of $75,000.

73.     Upon information and belief, Conner has solicited orders for, or sold MRO products to, additional Covered Customers (other than those named in the allegations above) since he resigned from Lawson.

74.     Lawson's ability to discover the full scope of the sales and solicitation efforts by Conner with their Covered Customers is necessarily limited.

**Price**

75.     Price's territory as a Lawson ESR included the following counties in Georgia: Dougherty, Terrell, Quitman, Randolph, Lee, Calhoun, Clay, Baker, Early, Miller, Seminole, Decatur, Grady, Mitchell, Thomas, Colquitt, Worth, Tift, Turner, Crisp, Sumter and Dooly.

76.     Price's territory as a Partsmaster sales representative included the same counties in Georgia.

77.     During his employment with Lawson as ESR and previously with Partsmaster, Price was responsible for developing relationships with existing customers and cultivating prospective customers in his designated territories. In all respects, Price was the key point of contact for customers to which he sold MRO products on behalf of Lawson and Partsmaster.

78. Price was able to develop close relationships with customers of Partsmaster and Lawson, understand their purchasing needs, and earn their trust. Price had full and complete access to pricing parameters, historical prices charged to customers, sales, marketing, technical, and other information about products and services that Partsmaster and Lawson sold.

79. This access allowed Price to facilitate the procurement of orders for, and sales of, MRO products and to better service the customers within his Partsmaster and Lawson territories.

80. The access Conner enjoyed to this type of customer information was solely for his use on behalf of Partsmaster and Lawson and allowed him to develop customer goodwill, which is crucial to the sales process.

81. During the last year of his employment with Partsmaster and Lawson, Price sold MRO products to numerous customers and achieved sales in 2020 above $310,000.

82. The customers whom Price contacted on Lawson's behalf in his former territory constitute "Covered Customers" under Section 3.1(a)(i) of his Lawson Agreement.

83. Price voluntarily resigned from Lawson on February 21, 2021.

84. Price joined Momar as a sales representative.

85. After Price's resignation, a representative of Lawson visited Glen Heard Farms, which had been the largest Lawson customer serviced by Price. Lawson was informed that Price had been selling for Momar since January 2021, even before he resigned from Lawson.

86. Another Lawson representative later visited Flint Tractor, another Lawson customer that had been serviced by Price, and actually walked in on Price in the midst of soliciting business from the customer.

87.     Lawson has been unable to reclaim business from these and other accounts formerly assigned to Price and has suffered a total impairment of customer goodwill with such customers.

88.     Based on historical profit margins associated with MRO sales, the impaired customer relationships and goodwill stemming from Price's solicitation of these accounts result in lost profits to Lawson in excess of $75,000.

89.     Upon information and belief, Price has solicited orders for, or sold MRO products to, additional Covered Customers (other than those named in the allegations above) since he resigned from Lawson.

90.     Lawson's ability to discovery the full scope of the sales and solicitation efforts by Price with their Covered Customers is necessarily limited.

**Byron**

91.     Byron's territory as a Lawson ESR included the following counties in Colorado: Adams, Boulder, Broomfield, Douglas, Elbert, Jefferson, Saguache, Rio Grande, Chaffee, Alamosa, Costilla, Conejos, Pueblo, El Paso, Denter, Park, Weld, and Arapahoe.

92.     Byron's territory as a Partsmaster sales representative included the same counties in Colorado.

93.     During his employment with Lawson as ESR and previously with Partsmaster, Byron was responsible for developing relationships with existing customers and cultivating prospective customers in his designated territories. In all respects, Byron was the key point of contact for customers to which he sold MRO products on behalf of Lawson and Partsmaster.

94.     Byron was able to develop close relationships with customers of Partsmaster and Lawson, understand their purchasing needs, and earn their trust. Byron had full and complete

access to pricing parameters, historical prices charged to customers, sales, marketing, technical, and other information about products and services that Partsmaster and Lawson sold.

95.     This access allowed Byron to facilitate the procurement of orders for, and sales of, MRO products and to better service the customers within his Partsmaster and Lawson territories.

96.     The access Byron enjoyed to this type of customer information was solely for his use on behalf of Partsmaster and Lawson and allowed him to develop customer goodwill, which is crucial to the sales process.

97.     During the last year of his employment with Partsmaster and Lawson, Byron sold MRO products to numerous customers and achieved sales above $100,000.

98.     The customers whom Byron contacted on Lawson's behalf in his former territory constitute "Covered Customers" under Section 3.1(a)(i) of his Lawson Agreement.

99.     Byron voluntarily resigned from Lawson on February 14, 2022.

100.    Byron then joined Momar as a sales representative.

101.    After Byron's resignation, Byron solicited MRO product sales from more than 60 Covered Customers under his Lawson Agreement.

102.    Lawson became aware of Byron's solicitations on behalf of Momar through its own visits to the customers formerly assigned to Byron. During these visits, Lawson representatives were told that Byron had falsely stated to Lawson customers that Byron was still employed by Partsmaster.

103.    As part of his solicitations of these more than 60 Lawson customers, Byron wore a Partsmaster shirt to falsely create the impression in the target customer that Byron continued to be associated with Partsmaster.

104.    As part of his solicitations of these more than 60 Lawson customers, Byron told the targeted customers that, although he remained employed by Partsmaster, they would receive a bill from Momar.

105.    In the year prior to his resignation, Byron sold MRO products on behalf of Lawson to each of the more than 60 Covered Customers that he solicited after joining Momar.

106.    Upon information and belief, Byron has solicited orders or, or sold, MRO products to additional Covered Customers since resigning from Lawson.

107.    Lawson has been unable to reclaim business from these and other accounts formerly assigned to Byron and has suffered a total impairment of customer goodwill with such customers.

108.    Based on historical profit margins associated with MRO sales, the impaired customer relationships and goodwill stemming from Byron's solicitation of these accounts result in lost profits to Lawson in excess of $75,000.

109.    Upon information and belief, Byron has solicited orders for, or sold MRO products to, additional Covered Customers (other than those named in the allegations above) since he resigned from Lawson.

110.    Lawson's ability to discovery the full scope of the sales and solicitation efforts by Byron with their Covered Customers is necessarily limited.

**Myers**

111.    Myers' territory as a Lawson ESR included the following counties in Idaho: Adams, Valley, Washington, Payette, Boise, Gem, Ada, Canyon, Owyhee and Elmore.

112.    Myers' territory as a Lawson ESR including the following counties in Oregon: Malhure, Baker and Wallowa.

16

113.    Myers' territory as a Partsmaster sales representative included the same counties in Idaho and Oregon.

114.    During his employment with Lawson as ESR and previously with Partsmaster, Myers was responsible for developing relationships with existing customers and cultivating prospective customers in his designated territories. In all respects, Myers was the key point of contact for customers to which he sold MRO products on behalf of Lawson and Partsmaster.

115.    Myers was able to develop close relationships with customers of Partsmaster and Lawson, understand their purchasing needs, and earn their trust. Myers had full and complete access to pricing parameters, historical prices charged to customers, sales, marketing, technical, and other information about products and services that Partsmaster and Lawson sold.

116.    This access allowed Myers to facilitate the procurement of orders for, and sales of, MRO products and to better service the customers within his Partsmaster and Lawson territories.

117.    The access Myers enjoyed to this type of customer information was solely for his use on behalf of Partsmaster and Lawson and allowed him to develop customer goodwill, which is crucial to the sales process.

118.    During the last year of his employment with Partsmaster and Lawson, Myers sold MRO products to numerous customers and achieved sales in 2020 of approximately $100,000.

119.    The customers whom Myers contacted on Lawson's behalf in his former territory constitute "Covered Customers" under Section 3.1(a)(i) of his Lawson Agreement.

120.    Myers voluntarily resigned from Lawson on January 4, 2022.

121.    Myers then joined Momar as a sales representative.

122.    After Myers' resignation, Myers solicited MRO product sales from Fruitland Schools Transportation, which is a Covered Customers under his Lawson Agreement.

123.    Lawson became aware of Myers' solicitations on behalf of Momar through its own visits to the customer.

124.    In the year prior to his resignation, Myers sold MRO products on behalf of Lawson to Fruitland Schools Transportation.

125.    Upon information and belief, Myers has solicited orders or, or sold, MRO products to additional Covered Customers since resigning from Lawson.

126.    Lawson has been unable to reclaim business from these and other accounts formerly assigned to Myers and has suffered a total impairment of customer goodwill with such customers.

127.    Based on historical profit margins associated with MRO sales, the impaired customer relationships and goodwill stemming from Myers' solicitation of these accounts result in lost profits to Lawson in excess of $75,000.

128.    Upon information and belief, Myers has solicited orders for, or sold MRO products to, additional Covered Customers (other than those named in the allegations above) since he resigned from Lawson.

129.    Lawson's ability to discovery the full scope of the sales and solicitation efforts by Myers with their Covered Customers is necessarily limited.

**Patterson**

130.    Patterson's territory as a Lawson ESR included the following counties in Oregon: Baker, Grant, Morrow, Umatilla, Union, Wallowa, Gilliam, Sherman, Wasco, Hood, River and Harney.

131. Patterson's territory as a Lawson ESR also included Benton County, Washington.

132. During his employment with Lawson as ESR and previously with Partsmaster, Patterson was responsible for developing relationships with existing customers and cultivating prospective customers in his designated territories. In all respects, Patterson was the key point of contact for customers to which he sold MRO products on behalf of Lawson and Partsmaster.

133. Patterson was able to develop close relationships with customers of Partsmaster and Lawson, understand their purchasing needs, and earn their trust. Patterson had full and complete access to pricing parameters, historical prices charged to customers, sales, marketing, technical, and other information about products and services that Partsmaster and Lawson sold.

134. This access allowed Patterson to facilitate the procurement of orders for, and sales of, MRO products and to better service the customers within his Partsmaster and Lawson territories.

135. The access Patterson enjoyed to this type of customer information was solely for his use on behalf of Partsmaster and Lawson and allowed him to develop customer goodwill, which is crucial to the sales process.

136. During the last year of his employment with Lawson, Patterson sold MRO products to numerous customers and achieved sales in 2020 of over $180,000.

137. The customers whom Patterson contacted on Lawson's behalf in his former territory constitute "Covered Customers" under Section 3.1(a)(i) of his Lawson Agreement.

138. Patterson voluntarily resigned from Lawson, and his last day of employment was May 19, 2023.

139. Patterson joined Momar as a sales representative.

140.    After Patterson's resignation, Patterson solicited MRO product sales from multiple Covered Customers under his Lawson Agreement, including Barreto Manufacturing.

141.    Lawson became aware of Patterson's solicitations on behalf of Momar through its own visits to customers. Covered Customers under the Lawson Agreement, including representatives of Barreto Manufacturing, told Lawson employees that they were doing business Momar and with Patterson as their direct point of contact.

142.    In the year prior to his resignation, Patterson sold MRO products on behalf of Lawson to Barreto Manufacturing.

143.    Upon information and belief, Patterson has solicited orders or, or sold, MRO products to additional Covered Customers since resigning from Lawson.

144.    Lawson has been unable to reclaim business from these and other accounts formerly assigned to Patterson and has suffered a total impairment of customer goodwill with such customers.

145.    Based on historical profit margins associated with MRO sales, the impaired customer relationships and goodwill stemming from Patterson's solicitation of these accounts result in lost profits to Lawson in excess of $75,000.

146.    Upon information and belief, Patterson has solicited orders for, or sold MRO products to, additional Covered Customers (other than those named in the allegations above) since he resigned from Lawson.

147.    Lawson's ability to discovery the full scope of the sales and solicitation efforts by Patterson with their Covered Customers is necessarily limited.

**Gardner**

148.     Gardner's territory as a Lawson ESR included the following counties in Washington, Idaho and Montana: Spokane, Lincoln, Adams, Grant, Douglas, Stevens, Okanogan, Ferry, Benton, Franklin, Yakima, Chelan, Kittitas, Pend Oreille, Kootenai, Benewah, Shoshone, Bonner, Ravalli and Missoula.

149.     During his employment with Lawson as ESR and previously with Partsmaster, Gardner was responsible for developing relationships with existing customers and cultivating prospective customers in his designated territories. In all respects, Gardner was the key point of contact for customers to which he sold MRO products on behalf of Lawson and Partsmaster.

150.     Gardner was able to develop close relationships with customers of Partsmaster and Lawson, understand their purchasing needs, and earn their trust. Patterson had full and complete access to pricing parameters, historical prices charged to customers, sales, marketing, technical, and other information about products and services that Partsmaster and Lawson sold.

151.     This access allowed Gardner to facilitate the procurement of orders for, and sales of, MRO products and to better service the customers within his Partsmaster and Lawson territories.

152.     The access Gardner enjoyed to this type of customer information was solely for his use on behalf of Partsmaster and Lawson and allowed him to develop customer goodwill, which is crucial to the sales process.

153.     During the last year of his employment Lawson, Gardner sold MRO products to numerous customers and achieved sales in 2020 of over $500,000.

154.     The customers whom Gardner contacted on Lawson's behalf in his former territory constitute "Covered Customers" under Section 3.1(a)(i) of his Lawson Agreement.

155.    Gardner voluntarily resigned from Lawson, and his last day of employment was May 24, 2023.

156.    Gardner joined Momar as a sales representative.

157.    After Gardner's resignation, Gardner solicited MRO product sales from multiple Covered Customers under his Lawson Agreement, including Othello School District.

158.    Lawson became aware of Gardner's solicitations on behalf of Momar through its own visits to customers. Covered Customers under the Lawson Agreement, including representatives of Othello School District, told Lawson employees that they were doing business Momar and with Gardner as their direct point of contact.

159.    According to these customers, Gardner, as part of his solicitations, told them that although he had left Lawson to work for a different company, he was still able to provide services for them just as he did while working for Lawson.

160.    In the year prior to his resignation, Gardner sold MRO products on behalf of Lawson to Othello School District.

161.    Upon information and belief, Gardner has solicited orders or, or sold, MRO products to additional Covered Customers since resigning from Lawson.

162.    Lawson has been unable to reclaim business from these and other accounts formerly assigned to Gardner and has suffered a total impairment of customer goodwill with such customers.

163.    Based on historical profit margins associated with MRO sales, the impaired customer relationships and goodwill stemming from Gardner's solicitation of these accounts result in lost profits to Lawson in excess of $75,000.

164. Upon information and belief, Gardner has solicited orders for, or sold MRO products to, additional Covered Customers (other than those named in the allegations above) since he resigned from Lawson.

165. Lawson's ability to discovery the full scope of the sales and solicitation efforts by Gardner with their Covered Customers is necessarily limited.

## Goebel

166. Goebel's territory as a Lawson ESR included the following counties in Washington: Clark, Cowlitz, Grays Harbor, King, Lewis, Pacific, Pierce, Thurston, Mason, Kitsap, Yakima, Clallam, Jefferson, Wahkiakum, Whatcom, Skagit and Snohomish.

167. During his employment with Lawson as ESR and previously with Partsmaster, Goebel was responsible for developing relationships with existing customers and cultivating prospective customers in his designated territories. In all respects, Goebel was the key point of contact for customers to which he sold MRO products on behalf of Lawson and Partsmaster.

168. Goebel was able to develop close relationships with customers of Partsmaster and Lawson, understand their purchasing needs, and earn their trust. Goebel had full and complete access to pricing parameters, historical prices charged to customers, sales, marketing, technical, and other information about products and services that Partsmaster and Lawson sold.

169. This access allowed Goebel to facilitate the procurement of orders for, and sales of, MRO products and to better service the customers within his Partsmaster and Lawson territories.

170. The access Goebel enjoyed to this type of customer information was solely for his use on behalf of Partsmaster and Lawson and allowed him to develop customer goodwill, which is crucial to the sales process.

171.    During the last year of his employment Lawson, Goebel sold MRO products to numerous customers and achieved sales in 2020 of approximately $300,000.

172.    The customers whom Goebel contacted on Lawson's behalf in his former territory constitute "Covered Customers" under Section 3.1(a)(i) of his Lawson Agreement.

173.    Goebel voluntarily resigned from Lawson, and his last day of employment was May 24, 2023.

174.    Goebel joined Momar as a sales representative.

175.    After Goebel resignation, Goebel solicited MRO product sales from multiple Covered Customers under his Lawson Agreement, including Puyallup School District.

176.    Lawson became aware of Goebel's solicitations on behalf of Momar through its own visits to customers. Covered Customers under the Lawson Agreement, including representatives of Puyallup School District, told Lawson employees that they were doing business Momar and with Goebel as their direct point of contact.

177.    In the year prior to his resignation, Goebel sold MRO products on behalf of Lawson to Puyallup School District.

178.    Upon information and belief, Goebel has solicited orders or, or sold, MRO products to additional Covered Customers since resigning from Lawson.

179.    Lawson has been unable to reclaim business from these and other accounts formerly assigned to Goebel and has suffered a total impairment of customer goodwill with such customers.

180.    Based on historical profit margins associated with MRO sales, the impaired customer relationships and goodwill stemming from Goebel's solicitation of these accounts result in lost profits to Lawson in excess of $75,000.

181.     Upon information and belief, Goebel has solicited orders for, or sold MRO products to, additional Covered Customers (other than those named in the allegations above) since he resigned from Lawson.

182.     Lawson's ability to discovery the full scope of the sales and solicitation efforts by Goebel with their Covered Customers is necessarily limited.

### Markowitz

183.     Markowitz's territory as a Lawson ESR included the following counties in Florida: Broward, Dade and Palm Beach.

184.     During his employment with Lawson as ESR and previously with Partsmaster, Markowitz was responsible for developing relationships with existing customers and cultivating prospective customers in his designated territories. In all respects, Markowitz was the key point of contact for customers to which he sold MRO products on behalf of Lawson and Partsmaster.

185.     Markowitz was able to develop close relationships with customers of Partsmaster and Lawson, understand their purchasing needs, and earn their trust. Markowitz had full and complete access to pricing parameters, historical prices charged to customers, sales, marketing, technical, and other information about products and services that Partsmaster and Lawson sold.

186.     This access allowed Markowitz to facilitate the procurement of orders for, and sales of, MRO products and to better service the customers within his Partsmaster and Lawson territories.

187.     The access Markowitz enjoyed to this type of customer information was solely for his use on behalf of Partsmaster and Lawson and allowed him to develop customer goodwill, which is crucial to the sales process.

188.    During the last year of his employment Lawson, Markowitz sold MRO products to numerous customers and achieved sales in 2020 of . He had a book of business of over $500,000.

189.    The customers whom Markowitz contacted on Lawson's behalf in his former territory constitute "Covered Customers" under Section 3.1(a)(i) of his Lawson Agreement.

190.    Markowitz voluntarily resigned from Lawson, and his last day of employment was June 30, 2023.

191.    Markowitz joined Momar as a sales representative.

192.    After Markowitz's resignation, Markowitz solicited MRO product sales from multiple Covered Customers under his Lawson Agreement, including Palm Beach State College, A/C Shop, Lake Worth Power Plant, and RC Truck Sales.

193.    Lawson became aware of Markowitz's solicitations on behalf of Momar through its own visits to customers. Covered Customers under the Lawson Agreement, including representatives of Palm Beach State College, A/C Shop, RC Truck Sales, told Lawson employees that they were doing business Momar and with Markowitz as their direct point of contact.

194.    In the year prior to his resignation, Markowitz sold MRO products on behalf of Lawson to each of the customers listed in the above paragraphs.

195.    Upon information and belief, Markowitz has solicited orders or, or sold, MRO products to additional Covered Customers since resigning from Lawson.

196.    Lawson has been unable to reclaim business from these and other accounts formerly assigned to Markowitz and has suffered a total impairment of customer goodwill with such customers.

197.    Based on historical profit margins associated with MRO sales, the impaired customer relationships and goodwill stemming from Markowitz solicitation of these accounts result in lost profits to Lawson in excess of $75,000.

198.    Upon information and belief, Markowitz has solicited orders for, or sold MRO products to, additional Covered Customers (other than those named in the allegations above) since he resigned from Lawson.

199.    Lawson's ability to discovery the full scope of the sales and solicitation efforts by Markowitz with their Covered Customers is necessarily limited.

**Watkins**

200.    Watkin's territory as a Lawson ESR included the following counties in Georgia: Barrow, Cherokee, Clarke, Clayton, Cobb, Coweta, Dawson, Dekalb, Elbert, Fayette, Forsyth, Fulton, Gwinnett, Hall, Jackson, Lumpkin, Madison, Oconee, Oglethorpe and Walton.

201.    During her employment with Lawson as ESR and previously with Partsmaster, Watkins was responsible for developing relationships with existing customers and cultivating prospective customers in her designated territories. In all respects, Watkins was the key point of contact for customers to which she sold MRO products on behalf of Lawson and Partsmaster.

202.    Watkins was able to develop close relationships with customers of Partsmaster and Lawson, understand their purchasing needs, and earn their trust. Watkins had full and complete access to pricing parameters, historical prices charged to customers, sales, marketing, technical, and other information about products and services that Partsmaster and Lawson sold.

203.    This access allowed Watkins to facilitate the procurement of orders for, and sales of, MRO products and to better service the customers within her Partsmaster and Lawson territories.

204. The access Watkins enjoyed to this type of customer information was solely for her use on behalf of Partsmaster and Lawson and allowed her to develop customer goodwill, which is crucial to the sales process.

205. During the last year of her employment Lawson, Watkins sold MRO products to numerous customers and achieved sales in 2020 of over $650,000.

206. The customers whom Watkins contacted on Lawson's behalf in her former territory constitute "Covered Customers" under Section 3.1(a)(i) of her Lawson Agreement.

207. Watkins voluntarily resigned from Lawson, and her last day of employment was June 30, 2023.

208. Watkins then joined Momar as a sales representative.

209. After Watkins' resignation, Watkins solicited MRO product sales from multiple Covered Customers under her Lawson Agreement, including Ascendum/Volvo and United Rentals.

210. Lawson became aware of Watkins' solicitations on behalf of Momar through its own visits to customers, and attempts to visit others. Covered Customers under the Lawson Agreement, including representatives of Ascendum/Volvo and United Rentals, told Lawson employees that they were doing business Momar and with Watkins as their direct point of contact.

211. In the year prior to her resignation, Watkins sold MRO products on behalf of Lawson to each of the customers listed in the above paragraphs.

212. Upon information and belief, Watkins has solicited orders or, or sold, MRO products to additional Covered Customers since resigning from Lawson.

213. Lawson has been unable to reclaim business from these and other accounts formerly assigned to Watkins and has suffered a total impairment of customer goodwill with such customers.

214. Based on historical profit margins associated with MRO sales, the impaired customer relationships and goodwill stemming from Watkins solicitation of these accounts result in lost profits to Lawson in excess of $75,000.

215. Upon information and belief, Watkins has solicited orders for, or sold MRO products to, additional Covered Customers (other than those named in the allegations above) since he resigned from Lawson.

216. Lawson's ability to discovery the full scope of the sales and solicitation efforts by Watkins with their Covered Customers is necessarily limited.

IV. **Lawson's Attempts to Protect Its Contractual Rights Against the Individual Defendants' Unlawful Conduct.**

217. Through written correspondence, Lawson has reminded the Individual Defendants of the post-employment obligations they each owe to Lawson under their respective Lawson Agreements and/or Partsmaster Agreements.

218. Through written correspondence, Lawson has demanded the Individual Defendants cease and desist from their demonstrated violations of their respective Lawson Agreements and/or Partsmaster Agreements.

219. Lawson has directed its correspondence to the Individual Defendants both to the Individual Defendants themselves and to attorneys representing the Individual Defendants and their new employer, Momar.

220. Lawson's efforts to secure adherence by the Individual Defendants to their post-employment contractual obligations have been unsuccessful.

221.    In response to Lawson's correspondence and efforts to avoid this litigation, the Individual Defendants signaled that they have no intention to honor their contractual commitments to Lawson.

## CAUSES OF ACTION

### COUNT ONE – BREACH OF CONTRACT
### (Against Conner)

222.    Lawson incorporates the allegations in Paragraphs 1 through 221 as though pleaded in this paragraph.

223.    Conner's Lawson Agreement (Exhibit 1) is a valid, binding contract between Lawson and Conner, fully supported by adequate consideration.

224.    Section 3.3 of Conner's Lawson Agreement is a valid and enforceable restrictive covenant. The non-solicitation covenant is designed to protect Lawson's legitimate business interest in customer relationships and goodwill to which Conner had access during employment with Lawson and with the business Lawson acquired under the Partsmaster Acquisition.

225.    Section 3.3 of Conner's Lawson Agreement is reasonable, in that it is narrowly tailored to protect only these customer relationships and goodwill, not competition per se for a limited period of time. The covenant poses no undue hardship on Conner, and the enforcement of Section 3.3 serves the public interest.

226.    Conner has solicited, serviced, or managed Covered Customers on behalf of Momar, a direct competitor of Lawson.

227.    Conner has breached Section 3.3 of his Lawson Agreement by soliciting orders for MRO products from the same customers to which he sold similar products during his employment with Partsmaster and Lawson.

228.     Conner's solicitations of these customers have been for products competitive with those offered for sale by Lawson during the one-year period before Conner's voluntary resignation from Lawson.

229.     Conner has engaged in extensive solicitation efforts in violation of Section 3.3 of his Lawson Agreement on behalf of Momar, a competitor of Lawson and a supplier of MRO products.

230.     Lawson has been damaged by Conner's breach and has incurred lost profits in an amount to be proven at trial.

### COUNT TWO – BREACH OF CONTRACT
### (Against Price)

231.     Lawson incorporates the allegations in Paragraphs 1 through 221 as though pleaded in this paragraph.

232.     Price's Lawson Agreement (Exhibit 2) is a valid, binding contract between Lawson and Price, fully supported by adequate consideration.

233.     Section 3.3 of Price's Lawson Agreement is a valid and enforceable restrictive covenant. The non-solicitation covenant is designed to protect Lawson's legitimate business interest in customer relationships and goodwill to which Price had access during employment with Lawson and with the business Lawson acquired under the Partsmaster Acquisition.

234.     Section 3.3 of Price's Lawson Agreement is reasonable, in that it is narrowly tailored to protect only these customer relationships and goodwill, not competition per se for a limited period of time. The covenant poses no undue hardship on Price, and the enforcement of Section 3.3 serves the public interest.

235.     Price has solicited, serviced, or managed Covered Customers on behalf of Momar, a direct competitor of Lawson.

236.    Price has breached Section 3.3 of his Lawson Agreement by soliciting orders for MRO products from the same customers to which he sold similar products during his employment with Partsmaster and Lawson.

237.    Price's solicitations of these customers have been for products competitive with those offered for sale by Lawson during the one-year period before Price's voluntary resignation from Lawson.

238.    Price has engaged in extensive solicitation efforts in violation of Section 3.3 of his Lawson Agreement on behalf of Momar, a competitor of Lawson and a supplier of MRO products.

239.    Lawson has been damaged by Price's breach and has incurred lost profits in an amount to be proven at trial.

**COUNT THREE – BREACH OF CONTRACT**
**(Against Byron)**

240.    Lawson incorporates the allegations in Paragraphs 1 through 221 as though pleaded in this paragraph.

241.    Byron's Lawson Agreement (Exhibit 3) is a valid, binding contract between Lawson and Byron, fully supported by adequate consideration.

242.    Section 3.3 of Byron's Lawson Agreement is a valid and enforceable restrictive covenant. The non-solicitation covenant is designed to protect Lawson's legitimate business interest in customer relationships and goodwill to which Byron had access during employment with Lawson and with the business Lawson acquired under the Partsmaster Acquisition.

243.    Section 3.3 of Byron's Lawson Agreement is reasonable, in that it is narrowly tailored to protect only these customer relationships and goodwill, not competition per se for a

limited period of time. The covenant poses no undue hardship on Byron, and the enforcement of Section 3.3 serves the public interest.

244.    Byron has solicited, serviced, or managed Covered Customers on behalf of Momar, a direct competitor of Lawson.

245.    Byron has breached Section 3.3 of his Lawson Agreement by soliciting orders for MRO products from the same customers to which he sold similar products during his employment with Partsmaster and Lawson.

246.    Byron's solicitations of these customers have been for products competitive with those offered for sale by Lawson during the one-year period before Byron's voluntary resignation from Lawson.

247.    Byron has engaged in extensive solicitation efforts in violation of Section 3.3 of his Lawson Agreement on behalf of Momar, a competitor of Lawson and a supplier of MRO products.

248.    Lawson has been damaged by Byron's breach and has incurred lost profits in an amount to be proven at trial.

## COUNT FOUR – BREACH OF CONTRACT
### (Against Myers)

249.    Lawson incorporates the allegations in Paragraphs 1 through 221 as though pleaded in this paragraph.

250.    Myers' Lawson Agreement (Exhibit 4) is a valid, binding contract between Lawson and Myers, fully supported by adequate consideration.

251.    Section 3.3 of Myers' Lawson Agreement is a valid and enforceable restrictive covenant. The non-solicitation covenant is designed to protect Lawson's legitimate business

interest in customer relationships and goodwill to which Myers had access during employment with Lawson and with the business Lawson acquired under the Partsmaster Acquisition.

252. Section 3.3 of Myers' Lawson Agreement is reasonable, in that it is narrowly tailored to protect only these customer relationships and goodwill, not competition per se for a limited period of time. The covenant poses no undue hardship on Myers, and the enforcement of Section 3.3 serves the public interest.

253. Myers has solicited, serviced, or managed Covered Customers on behalf of Momar, a direct competitor of Lawson.

254. Myers has breached Section 3.3 of his Lawson Agreement by soliciting orders for MRO products from the same customers to which he sold similar products during his employment with Partsmaster and Lawson.

255. Myers' solicitations of these customers have been for products competitive with those offered for sale by Lawson during the one-year period before Myers' voluntary resignation from Lawson.

256. Myers has engaged in extensive solicitation efforts in violation of Section 3.3 of his Lawson Agreement on behalf of Momar, a competitor of Lawson and a supplier of MRO products.

257. Lawson has been damaged by Myers' breach and has incurred lost profits in an amount to be proven at trial.

## COUNT FIVE – BREACH OF CONTRACT
### (Against Patterson)

258. Lawson incorporates the allegations in Paragraphs 1 through 221 as though pleaded in this paragraph.

259.    Patterson's Lawson Agreement (Exhibit 5) is a valid, binding contract between Lawson and Patterson, fully supported by adequate consideration.

260.    Section 3.3 of Patterson's Lawson Agreement is a valid and enforceable restrictive covenant. The non-solicitation covenant is designed to protect Lawson's legitimate business interest in customer relationships and goodwill to which Patterson had access during employment with Lawson and with the business Lawson acquired under the Partsmaster Acquisition.

261.    Section 3.3 of Patterson's Lawson Agreement is reasonable, in that it is narrowly tailored to protect only these customer relationships and goodwill, not competition per se for a limited period of time. The covenant poses no undue hardship on Patterson, and the enforcement of Section 3.3 serves the public interest.

262.    Patterson has solicited, serviced, or managed Covered Customers on behalf of Momar, a direct competitor of Lawson.

263.    Patterson has breached Section 3.3 of his Lawson Agreement by soliciting orders for MRO products from the same customers to which he sold similar products during his employment with Partsmaster and Lawson.

264.    Patterson's solicitations of these customers have been for products competitive with those offered for sale by Lawson during the one-year period before Patterson's voluntary resignation from Lawson.

265.    Patterson has engaged in extensive solicitation efforts in violation of Section 3.3 of his Lawson Agreement on behalf of Momar, a competitor of Lawson and a supplier of MRO products.

266.    Lawson has been damaged by Patterson's breach and has incurred lost profits in an amount to be proven at trial.

### COUNT SIX – BREACH OF CONTRACT
### (Against Gardner)

267.    Lawson incorporates the allegations in Paragraphs 1 through 221 as though pleaded in this paragraph.

268.    Gardner's Lawson Agreement (Exhibit 6) is a valid, binding contract between Lawson and Gardner, fully supported by adequate consideration.

269.    Section 3.3 of Gardner's Lawson Agreement is a valid and enforceable restrictive covenant. The non-solicitation covenant is designed to protect Lawson's legitimate business interest in customer relationships and goodwill to which Gardner had access during employment with Lawson and with the business Lawson acquired under the Partsmaster Acquisition.

270.    Section 3.3 of Gardner's Lawson Agreement is reasonable, in that it is narrowly tailored to protect only these customer relationships and goodwill, not competition per se for a limited period of time. The covenant poses no undue hardship on Gardner, and the enforcement of Section 3.3 serves the public interest.

271.    Gardner has solicited, serviced, or managed Covered Customers on behalf of Momar, a direct competitor of Lawson.

272.    Gardner has breached Section 3.3 of his Lawson Agreement by soliciting orders for MRO products from the same customers to which he sold similar products during his employment with Partsmaster and Lawson.

273.    Gardner's solicitations of these customers have been for products competitive with those offered for sale by Lawson during the one-year period before Gardner's voluntary resignation from Lawson.

274.     Gardner has engaged in extensive solicitation efforts in violation of Section 3.3 of his Lawson Agreement on behalf of Momar, a competitor of Lawson and a supplier of MRO products.

275.     Lawson has been damaged by Gardner's breach and has incurred lost profits in an amount to be proven at trial.

## COUNT SEVEN – BREACH OF CONTRACT
### (Against Goebel)

276.     Lawson incorporates the allegations in Paragraphs 1 through 221 as though pleaded in this paragraph.

277.     Goebel's Lawson Agreement (Exhibit 7) is a valid, binding contract between Lawson and Goebel, fully supported by adequate consideration.

278.     Section 3.3 of Goebel's Lawson Agreement is a valid and enforceable restrictive covenant. The non-solicitation covenant is designed to protect Lawson's legitimate business interest in customer relationships and goodwill to which Goebel had access during employment with Lawson and with the business Lawson acquired under the Partsmaster Acquisition.

279.     Section 3.3 of Goebel's Lawson Agreement is reasonable, in that it is narrowly tailored to protect only these customer relationships and goodwill, not competition per se for a limited period of time. The covenant poses no undue hardship on Goebel, and the enforcement of Section 3.3 serves the public interest.

280.     Goebel has solicited, serviced, or managed Covered Customers on behalf of Momar, a direct competitor of Lawson.

281.     Goebel has breached Section 3.3 of his Lawson Agreement by soliciting orders for MRO products from the same customers to which he sold similar products during his employment with Partsmaster and Lawson.

282.    Goebel's solicitations of these customers have been for products competitive with those offered for sale by Lawson during the one-year period before Goebel's voluntary resignation from Lawson.

283.    Goebel has engaged in extensive solicitation efforts in violation of Section 3.3 of his Lawson Agreement on behalf of Momar, a competitor of Lawson and a supplier of MRO products.

284.    Lawson has been damaged by Goebel's breach and has incurred lost profits in an amount to be proven at trial.

**COUNT EIGHT – BREACH OF CONTRACT**
**(Against Markowitz)**

285.    Lawson incorporates the allegations in Paragraphs 1 through 221 as though pleaded in this paragraph.

286.    Markowitz's Lawson Agreement (Exhibit 8) is a valid, binding contract between Lawson and Markowitz, fully supported by adequate consideration.

287.    Section 3.3 of Markowitz's Lawson Agreement is a valid and enforceable restrictive covenant. The non-solicitation covenant is designed to protect Lawson's legitimate business interest in customer relationships and goodwill to which Markowitz had access during employment with Lawson and with the business Lawson acquired under the Partsmaster Acquisition.

288.    Section 3.3 of Markowitz's Lawson Agreement is reasonable, in that it is narrowly tailored to protect only these customer relationships and goodwill, not competition per se for a limited period of time. The covenant poses no undue hardship on Markowitz, and the enforcement of Section 3.3 serves the public interest.

289.    Markowitz has solicited, serviced, or managed Covered Customers on behalf of Momar, a direct competitor of Lawson.

290.    Markowitz has breached Section 3.3 of his Lawson Agreement by soliciting orders for MRO products from the same customers to which he sold similar products during his employment with Partsmaster and Lawson.

291.    Markowitz's solicitations of these customers have been for products competitive with those offered for sale by Lawson during the one-year period before Markowitz's voluntary resignation from Lawson.

292.    Markowitz has engaged in extensive solicitation efforts in violation of Section 3.3 of his Lawson Agreement on behalf of Momar, a competitor of Lawson and a supplier of MRO products.

293.    Lawson has been damaged by Markowitz's breach and has incurred lost profits in an amount to be proven at trial.

## COUNT NINE – BREACH OF CONTRACT
### (Against Watkins)

294.    Lawson incorporates the allegations in Paragraphs 1 through 221 as though pleaded in this paragraph.

295.    Watkins' Lawson Agreement (Exhibit 9) is a valid, binding contract between Lawson and Watkins, fully supported by adequate consideration.

296.    Section 3.3 of Watkins' Lawson Agreement is a valid and enforceable restrictive covenant. The non-solicitation covenant is designed to protect Lawson's legitimate business interest in customer relationships and goodwill to which Watkins had access during employment with Lawson and with the business Lawson acquired under the Partsmaster Acquisition.

297.    Section 3.3 of Watkins' Lawson Agreement is reasonable, in that it is narrowly tailored to protect only these customer relationships and goodwill, not competition per se for a limited period of time. The covenant poses no undue hardship on Watkins, and the enforcement of Section 3.3 serves the public interest.

298.    Watkins has solicited, serviced, or managed Covered Customers on behalf of Momar, a direct competitor of Lawson.

299.    Watkins has breached Section 3.3 of his Lawson Agreement by soliciting orders for MRO products from the same customers to which he sold similar products during his employment with Partsmaster and Lawson.

300.    Watkins' solicitations of these customers have been for products competitive with those offered for sale by Lawson during the one-year period before Watkins' voluntary resignation from Lawson.

301.    Watkins has engaged in extensive solicitation efforts in violation of Section 3.3 of his Lawson Agreement on behalf of Momar, a competitor of Lawson and a supplier of MRO products.

302.    Lawson has been damaged by Watkins' breach and has incurred lost profits in an amount to be proven at trial.

## PRAYER FOR RELIEF

The Plaintiff, Lawson Products, Inc., respectfully requests that the Court enter a judgment and grant it the following relief:

(a)    An accounting of all sales, commissions, and profits which each Individual

Defendant has generated as a result of sales procured in violation of Section 3.3 of

their respective Lawson Agreement and/or Section 5 of their respective
Partsmaster Agreement;

(b)     An award of compensatory damages against each Individual Defendant, in an
amount to be proven at trial;

(c)     An award of court costs and attorneys' fees as part of any judgment, as provided
for in Section 5 of the Lawson Agreements; and

(d)     Any other relief the Court deems just and appropriate under the circumstances.

Dated: December 15, 2023                           Respectfully submitted,

                                                   **LAWSON PRODUCTS, INC.**

                                                   By: /s/ Richard T. Kienzler
                                                           One of its attorneys

                                                   Richard T. Kienzler
                                                   Colton D. Long
                                                   Littler Mendelson, P.C.
                                                   321 North Clark Street, Suite 1100
                                                   Chicago, Illinois 60654
                                                   Phone: (312) __
                                                   Email: rkienzler@littler.com
                                                           clong@littler.com

41

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney hereby certifies that on the date shown below, he caused a copy of the foregoing Complaint to be electronically filed with the Clerk of the Court for the United States District Court for the Northern District of Illinois using the Court's CM/ECF filing system, and that such filing will generate a notice and provide a copy of the document to any counsel of record.

Dated: December 15, 2023

*/s/ Richard T. Kienzler*
*Attorney for Lawson Products, Inc.*